Barbara E. Hoey
Elizabeth A. Quinlan
Jessica L. Berenbroick
**KELLEY DRYE & WARREN LLP**
101 Park Avenue
New York, New York  10178
(212) 808-7800
Attorneys for Defendants
  Morningside at Home, Inc. and Myrna Fenelon,
  incorrectly denominated as "Abi Myrna Fenelon"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RHONDA COBB, <br><br>           **Plaintiff,** <br><br>       -against- <br><br> **MORNINGSIDE AT HOME, INC. and ABI MYRNA FENELON,** <br><br> **Defendants.** | **Civil Action:  06 CV 13161 (DAB)** <br><br> **DEFENDANTS MORNINGSIDE AT HOME, INC. AND MYRNA FENELON'S LOCAL RULE 56.1 STATEMENT** |

       Defendants Morningside at Home, Inc. ("Morningside" or the "Agency") and

Myrna Fenelon, incorrectly denominated as "Abi Myrna Fenelon" ("Fenelon") (collectively the

"Defendants"), by and through their attorneys, Kelley Drye and Warren LLP, submit this

statement of material facts as to which they contend there is no genuine issue to be tried,

pursuant to Civil Rule 56.1(a) of the Local Rules of the Court for Southern District of New York.

## I.    THE PARTIES

        1.    Defendant Morningside is a not-for-profit corporation located in the

Bronx, New York.  (Ex. 2.)[1]

---

[1]   Numbers prefixed by "Ex." refer to exhibits annexed to the Declaration of Barbara E. Hoey, Esq. ("Hoey Decl.") submitted with the Notice of Motion.

2.      Among other services, Morningside owns a licensed Home Care Service Agency and provides aging patients in various communities in the Bronx with home care services.  (Ex. 3.)

3.      Among the types of employees Morningside hires to provide home care services are Home Health Aides ("HHAs") and Personal Care Aides ("PCAs") (collectively, "Aides").  Both positions have specific licensing and certification requirements mandated by the State of New York.  (Ex. 26. at 9; Ex. 3.)

4.      Specifically, New York State Law requires that all HHAs: have taken and passed a training course and received an HHA or PCA certificate; have undergone a criminal background check; and have undergone a pre-employment physical examination. (Ex. 26 at 11; Ex. 23 at 291-93; Ex. 25 at 13.)

5.      By state law, Morningside is required to have documentation in the Aides' files showing that each of these steps have been complied with.  (Ex. 23 at 283-84.)  Further, that documentation must be updated periodically, to ensure that all information in the files is current and complete.  (Ex. 26 at 14-16, 30-32.)

6.      It is essential that all of Morningside's Aides are in compliance with state laws and regulations issued by the New York State Department of Health ("NYS DOH").  (Ex. 23 at 284.)

7.      Plaintiff Rhonda Cobb was hired by Morningside in June of 2005 as a "Compliance Coordinator."  (Ex. 22 at 57)  Ms. Cobb was responsible for making sure that the HHAs and PCA's qualifications were in full compliance with applicable regulations.  (Ex. 23 at 283-84; Ex. 26 at 9.)  Morningside terminated Plaintiff approximately ten months later, after

Plaintiff had received verbal counseling, three written warnings and one verbal warning for her failure to adequately perform her job duties.  (Ex. 5; Ex. 6, 7, 8, 9.)

8.      Defendant Fenelon was hired by Morningside in September of 2005 as a Nursing Supervisor.  (Ex. 26 at 65-66.)  In that capacity, Ms. Fenelon was responsible for conducting orientations for newly-hired Aides; testing the competencies of the Aides by given them examinations; and generally overseeing the Aides.  (Ex. 24 at 17-18).

9.      Approximately two months after commencing employment with Morningside, Ms. Fenelon became the Director of a new program being launched by Morningside, the Assisted Living Program.  (Ex. 24 at 18.)  However, even in that new position, for all times relevant to the instant action, she maintained certain Nursing Supervisor duties.  (Ex. 24 at 17-19.)  Ms. Fenelon was not Plaintiff's supervisor.  (Ex. 24 at 23.)

## II.    PLAINTIFF'S APPLICATION TO MORNINGSIDE

10.     Just before Plaintiff was hired, Morningside was undergoing a period of growth and expansion.  (Ex. 26 at 25-26.)  The Agency went from about 10 Aides to between 60 and 70 Aides.  Id.

11.     Gay Wheeler-Smith was appointed as Director of Patient Services in 2004.  (Ex. 26 at 5-6.)

12.     In June 2005, the Agency needed a Compliance Coordinator to make sure that the HHAs and PCAs had all of the required certifications, that background testing and physicals were done, that all HHA and PCA files were complete and up to date, and that Morningside was otherwise in compliance with the state and federal regulations.  (Ex. 22 at 40-41.)

13.     Plaintiff applied for the position on June 1, 2005. (Ex. 4.)

14.     On her application to Morningside, Plaintiff did not disclose the nature of multiple criminal convictions.  (Ex. 4.)

15.     Specifically, prior to applying to Morningside, Plaintiff plead guilty to the following crimes: loitering; possession of a gun; and attempted sale of crack cocaine. (Ex. 22 at 10-16, 21-23.)  Plaintiff served time in prison as the result of her convictions for possession of a gun and attempted sale of crack cocaine.  (Ex. 22 at 22-23.)

16.     Plaintiff interviewed with Gay Wheeler-Smith, Morningside's Director of Patient Services, for the position of Compliance Coordinator.  (Ex. 22 at 38-40.)

17.     Ms. Wheeler-Smith explained that the job of Compliance Coordinator was critical to Morningside. (Ex. 22 at 40 -41.)  Ms. Wheeler-Smith told Ms. Cobb that her job was to organize and maintain the files of the HHAs and PCAs, making sure that the documentation for the HHAs and PCAs was complete and fully compliant with Department of Health regulations.  (Ex. 22 at 40-41.)  At that time, Morningside had between 60 and 80 HHAs and PCAs, combined, for whom the Compliance Coordinator would be responsible.  (Ex. 26 at 12.)

18.     During the interview, Plaintiff told Ms. Wheeler-Smith that she had experience with compliance and that in her last position, she handled compliance for close to 600 employees.  (Ex. 23 at 309-10.)  The resume Plaintiff submitted in connection with her application also reflects this.  (Pl. tr. at Ex. A)  Thus, Plaintiff had allegedly been accustomed to overseeing compliance of more than six times the number employees that Morningside had.  (Ex. 23 at 309-10.)

19.     Ms. Wheeler-Smith made the decision to hire Plaintiff in June of 2005 to be Compliance Coordinator.  (Ex. 22 at 57; Ex. 26 at 9.)

### III.    PLAINTIFF'S JOB RESPONSIBILITIES

20.    As Compliance Coordinator, Plaintiff was responsible for ensuring that all HHAs and PCAs were in compliance with the State Department of Health regulations. (Ex. 23 at 428-429; Ex. 3). Among the many documents required for HHAs and PCAs by state and federal regulations are various training certificates, annual health assessments, and documentation that "in service," or continuing education, requirements had been met. (Ex. 26 at 10-12, 14-16.)

21.    Plaintiff's compliance responsibilities included specific duties both at the time the Aides were hired and throughout the time the Aides were employed with Morningside. (Ex. 3; Ex. 26 at 10, 14.)

22.    Plaintiff acknowledges that she was an "essential part" of the hiring process. (Ex. 22 at 194.) At the hiring stage, she was responsible for scheduling applicant interviews; collecting post-interview information; maintaining logs of the status of job applicants; verifying applicants' references; making sure pre-employment tests for new hires were complete; verifying that applicants had completed physical exams; verifying and validating certificates and licenses by contacting training facilities directly to confirm that certifications were valid; and confirming that Aides had all other required documentation. (Ex. 3; Ex. 23 at 283; Ex. 26 at 10-11.)

23.    Plaintiff was also responsible for conducting criminal background checks of applicants. (Ex. 3.) In addition to getting fingerprints, Plaintiff was expected to use a software program called "Sterling" on every applicant, which provides a criminal background check within 24 – 48 hours. (Ex. 24 at 132-33.) It was critical that Plaintiff conduct this check on every applicant because the Aides would be going into people's homes and it was necessary to know if they had a criminal background. (Ex. 24 at132-33.)

24.    Additionally, Plaintiff was responsible for assisting the Nursing Supervisor with orientations for new hires. (Ex. 26 at 79.) Morningside would routinely have an orientation for new HHAs and PCAs, usually with about twelve to fifteen new employees per session. (Ex. 23 at 317.) It was Ms. Cobb's job to make sure that all of the new employees were fully compliant in their paperwork prior to the orientation and for putting together packets of materials for those orientation sessions. (Ex. 23 at 290-92; 396-98; Ex. 24 at 113-14; Ex. 25 at 17.)

25.    With respect to Aides who were already employed by Morningside, Plaintiff was responsible for making sure their documentation remained current and in good order. (Ex. 26 at 14-16.) For example, many of the documents, such medical exams, were only good for one year and needed to be obtained annually. Plaintiff was responsible for following up with the HHAs and PCAs and making sure they were compliant. (Ex. 26 at 14-16, 30-32.)

26.    Ms. Cobb was also responsible for answering phones and providing general office support. (Ex. 3.)

27.    Of all of these duties, the most critical was making sure that all HHAs at Morningside were fully compliant with NYS DOH regulations. (Ex. 26 at 9, 37-38; Ex. 24 at 25-26; Ex. 22 at 40-41; Ex. 23 at 283-4.) Plaintiff acknowledged at her deposition that she understood the consequences of failing to comply with the documentation requirements of New York State. She testified as follows:

> Q:    Just to summarize your responsibilities, you have an understanding that the State of New York requires that an individual employed as a home care, in the home care industry, satisfy certain requirements, correct?
>
> A:    Yes.

Q:    Part of your job as compliance coordinator was to make sure that Morningside At Home was in compliance with those state requirements, correct?

A:    Yes.

Q:    And the state can come in, and by "the state" I'm referring to the Department of Health, they can come in at any point and ask to audit or review the personnel files–

A:    Yes.

Q:    [ ] of the home care aides, correct?

A:    That's true.

Q:    If [the NYS DOH] order[s] the personnel files and find[s] that the proper documentation is not there, [Morningside] can be cited or fined, correct?

A:    That's true.

Q:    **Are you aware of whether, if [the NYS DOH] deemed the offense to be serious, [the NYS DOH] can even order the agency to shut down?**

A:    **Yes.**

(Ex. 23 at 283-84, emphasis added.)

## IV.    THE WORK ATMOSPHERE AT THE AGENCY

28.    Plaintiff worked in an environment that consisted almost entirely of female employees.  (Ex. 22 at 58, 64, 70; Ex. 23 at 266.)

29.    Plaintiff was hired by Morningside's Director, Gay Wheeler-Smith.  (Ex. 22 at 38-40.)  Plaintiff initially reported directly to her.  (Ex. 22 at 58; Ex. 25 at 7.)

30.    In August of 2005, Reinette Flores (also a woman) was hired as a Program Manager and Plaintiff began reporting to her.  (Ex. 25 at 7; Ex. 26 at 17.)  Ms. Flores remained Plaintiff's direct supervisor for the remainder of Plaintiff's employment at Morningside.  (Ex. 22 at 70.)  Ms. Flores reported to Ms. Wheeler-Smith.  (Ex. 24 at 21.)

31.    Ms. Fenelon, was hired in September 2005 as Nursing Supervisor. Ms. Fenelon reported to Ms. Wheeler-Smith.  (Ex. 26 at 65; Ex. 24 at 21.)

32.    Thus, all of the supervisors or members of management at Morningside that Plaintiff interacted with in the performance of her job duties were women.

33.    Plaintiff shared a small office with several female staff members – Ivette Pagan and Lissette Rivera, who also reported to Ms. Flores.  (Ex. 22 at 64; Ex. 23 at 266, 382; Ex. 26 at 17.)  In December 2005, Ms. Pagan, who was a payroll clerk, left Morningside and was replaced by Theresa Smith, who then shared the office with Plaintiff and Ms. Rivera.  (Ex. 22 at 64; Ex. 23 at 266, 380-82.)  On rare occasions, Victor Pagan, a registered nurse who worked part-time, would sit in the office also.  (Ex. 22 at 69.)  Ms. Fenelon also sat in that office for a short period of time.  (Ex. 24 at 22, 69.)  Thus, for the most part, the office was all women.

34.    Ms. Flores, Plaintiff's supervisor, sat in an office right outside of Plaintiff's.  (Ex. 22 at 67-68, 70-71.)

35.    Plaintiff also had a male colleague named David Figueroa, who was the office manager.  (Ex. 26 at 23.)  Mr. Figueroa did not sit in the same office as Plaintiff.  (Ex. 10; Ex. 22 at 63-72.)

36.    Working in close quarters in the office, the women chatted during the day.  (Ex. 22 at 156.)  They would sometimes joke about sex and talk about personal relationships.  (Ex. 24 at 67-69.)

37.    For example, Lisette Rivera and the other women joked about how Lisette was having an extramarital affair.  (Ex. 24 at 67-68.)

38.    Reinette Flores would make comments about her relationship with her husband and that she was not as excited about their lovemaking as he was.  (Ex. 24 at 68-69.)

39.     Ivette Pagan would talk about her boyfriend and would offer advice to Ms. Flores on how to spice up her sex life.  (Ex. 24 at 69)

40.     Victor Pagan and David Figueroa, when they were present, would partake in the jokes as well.  (Ex. 24 at 48, 69.)

41.     In this setting, Plaintiff shared intimate details of her relationship with her boyfriend – specifically, that her boyfriend was cheating on her.  (Ex. 22 at 161; Ex. 25 at 167.)

42.     On October 28, 2005, Plaintiff sent Ms. Fenelon, Reinette Flores, Ivette Pagan, Lisette Rivera, and Gay Wheeler-Smith an e-mail with the subject line, "To the Wonderful Women in my circle."  The e-mail extolled the virtues of female friendship.  The e-mail had a direction at the end to, "ONLY IF YOU WISH, pass this on to the women that God has placed in your life to make a difference," which is presumably what Plaintiff had done in sending the e-mail to her female colleagues. (Ex. 11.)

## V.   THE ALLEGED "HARASSMENT"

43.     According to the Complaint, Ms. Fenelon is the only person at Morningside who allegedly "harassed" Ms. Cobb.  (Ex. 1 at ¶¶ 12,16.)

44.     Defendant Fenelon never "yelled" at Ms. Cobb or raised her voice. (Ex. 22 at 77; Ex. 25 at 161.)  Ms. Fenelon did not use profanity or "curse" at Ms. Cobb.  (Ex. 25 at 161.)  Plaintiff also does not allege that Ms. Fenelon ever threatened her.  (Ex. 1 at ¶¶ 13,14.)

45.     Ms. Fenelon only "touched" Ms. Cobb once – when she allegedly "pat" Plaintiff on the buttocks, when Cobb was bending over getting a file from a drawer.  (Ex. 22 at 79-81.)

46.     Ms. Fenelon never asked Plaintiff to engage in any sexual act with her. (Ex. 22 at 83-84.)

47.    Ms. Fenelon never asked Ms. Cobb to go out socially with her.  (Ex. 22 at 84.)

48.    Plaintiff has no evidence, nor does she allege, that Ms. Fenelon was homosexual.  (Ex. 22 at 77; Ex. 25 at 162.)

49.    Plaintiff alleges the following incidents of purported "harassment," which were directed to Ms. Cobb directly[2]:

(a)    In September or October 2005 Fenelon "tapped" Plaintiff **once** on the buttocks as Plaintiff was bending over a file cabinet in the office and Ms. Fenelon walked past her.  Plaintiff alleges that she told Ms. Fenelon not to do that and Ms. Fenelon never did it again. (Ex. 22 at 79-83.)  Indeed, Plaintiff testified that after that incident, which was in September or October of 2005, Plaintiff cannot recall Ms. Fenelon ever touching her again, in any manner.  (Ex. 22 at 83.)

(b)    Sometime in October 2005, Ms. Fenelon allegedly commented that Plaintiff had big lips and big breasts.  (Ex. 22 at 142-43.)

(c)    On October 28, 2005, Ms. Fenelon sent Plaintiff an email that included the question, "Rhonda, why are you so big?"  Plaintiff interpreted "big" to mean "fat." (Ex. 22 at 145; Ex. 12.)

---

[2]    Defendants do not concede that these events occurred as Plaintiff alleges, but include them here for purposes of summary judgment.

50.    Additionally, Plaintiff alleges the following acts or comments that Plaintiff allegedly witnessed, but that were not directed toward Plaintiff:[3]

(a)    In September or October, 2005, Fenelon twice laughed and made a gyrating or dancing motion at the mention of Brian Kelly a male employee.  (Ex. 22 at 110-12.) Plaintiff did not tell Ms. Fenelon that she did not like the motion. (Ex. 22 at 111.)

(b)    In September 2005, Fenelon allegedly commented that a male employee, Victor Pagan, was gay and that "all he could do is let her sit on his face."  (Ex. 22 at 99-101.)

(c)    One evening in September or October 2005, during a conversation with Ms. Wheeler-Smith, Ms. Flores and Ms. Cobb – Ms. Fenelon made a joke and made a circular motion with her tongue.  (Ex. 22 at 118-119)  Ms. Wheeler-Smith joked to Ms. Fenelon that she was "doing it" wrong and the women in the office laughed.  (Ex. 22 at 119-120; Ex. 26 at 80-81.)

(d)    In October or November 2005, Ms. Fenelon, pointing to the office manager, David Figueroa's buttocks, allegedly said "this is all mine."  (Ex. 1 at ¶ 13(f).)

(e)    On November 16, 2005, Ms. Fenelon forwarded to Plaintiff an e-mail Ms. Fenelon had sent to David Figueroa, where she joked that she wanted to meet him in the parking lot because she "want[ed] [his] body."  (Ex. 1 at ¶ 13(g).)  Mr. Figueroa laughed at the e-mail.  (Ex. 24 at 48.)  Ms. Fenelon did not say anything to Ms. Cobb about the substance of the email.  Ms Cobb never told Ms. Fenelon she found it offensive. (Ex. 22 at 150.)

(f)    Sometime in January 2006, Ms. Fenelon made a comment to Ms. Flores about her pants being too tight.  Plaintiff alleges that Ms. Fenelon told Flores that her

---

[3]    Defendants do not concede that these events occurred as Plaintiff alleges, but include them here for purposes of summary judgment.

pants were "up her [pussy]."[4]  (Ex. 22 at 228-29) (Plaintiff spelled the word out).  Ms. Flores found the comment funny.  (Ex. 25 at 104.)

51.    With the exception of the alleged "pat" or "tap" on the buttocks, Plaintiff did not indicate to Ms. Fenelon that any of these comments or gestures were offensive to her. (Ex. 22 at 101-02, 111, 127, 137-8, 142-44, 146, 150-52.)

52.    Prior to late November 2005, Plaintiff did not advise anyone at Morningside that she found these exchanges with Ms. Fenelon or her co-workers to be offensive. (Ex. 22 at 224-27.)

53.    On or about November 27, 2005, Ms. Fenelon came into the office with a friend named Juanita.  (Ex. 22 at 219-21)  Also present in the office was Ivette Pagan.  (Ex. 22 at 219)  The women talked about Plaintiff's grandchild and Juanita commented on how young Plaintiff looked.  (Ex. 22 at 220-21)  Ms. Fenelon responded by sticking her tongue in her cheek and joked that Plaintiff looked young because "she swallows."  (Ex. 22 at 221-2; Ex. 24 at 53).

54.    The other women laughed. Ms. Cobb testified that she was "upset" and "turned around," but did not tell Ms. Fenelon that she was "offended" by that comment.  (Ex. 22 at 222-23; Ex. 24 at 53.)

55.    Plaintiff acknowledged that she knew Ms. Fenelon meant this gesture as a joke.  (Ex. 22 at 222; Ex. 24 at 53-54)

56.    Ms. Fenelon never referred specifically to oral sex, never used words to describe oral sex, and did not do anything physical other than to swirl her tongue inside of her mouth (Ex. 23 at 373-74).

---

[4]    Ms. Flores disputes that Ms. Fenelon used the word "pussy."  (Ex. 25 at 104.)  Ms. Fenelon also disputes that that word was used.  (Ex. 24 at 61.)  However, this discrepancies are immaterial.

A.     **Plaintiff Speaks To Her Manager, and The "Sexual" Comments Stop**

57.     The day after this exchange, Plaintiff told her supervisor, Reinette Flores, what Ms. Fenelon had said and that she was upset and offended. (Ex. 22 at 225-26.)

58.     Plaintiff instructed Ms. Flores, however, that she did not want a formal complaint made and that she did not want Ms. Flores to speak with Ms. Fenelon. (Ex. 25 at 29, 36.)

59.     Ms. Flores nonetheless spoke with Ms. Fenelon that same day and advised Ms. Fenelon that Plaintiff did not want her to joke with her in that way. (Ex. 25 at 29-30.)

60.     **After Ms. Flores spoke with Ms. Fenelon at the end of November 2005, Ms. Fenelon did not make a single sexual remark or gesture to Plaintiff.** (Ex. 22 at 227-31; Ex. 23 at 380.)

61.     In December 2005, Plaintiff spoke to Theresa Smith, a payroll coordinator who shared an office with Plaintiff, about the conversation with Ms. Fenelon and "Juanita." (Ex. 23 at 385-87.)

62.     Ms. Cobb was told Ms. Smith's title was "Human Resources Coordinator." (Ex. 23 at 383.)

63.     Ms. Cobb did not know Ms. Smith's responsibilities, and did not know whether she had any management role (Ex. 23 at 382).

64.     Ms. Cobb told Ms. Smith about the incident with Ms. Fenelon in November. (Ex. 23 at 387.)

65.     Ms. Smith did not give Ms. Cobb any advice or tell her what to do. (Ex. 23 at 387-88.)

66.     After Ms. Cobb spoke with Ms. Flores, there were no more comments to

her from Ms. Fenelon:

Q:      After you had the conversation with Ms. Flores, did Ms.
        Fenelon ever discuss sex with you or in your presence
        again?

A:      No.

Q:      After you had this conversation with Ms. Flores, did Ms.
        Fenelon make any gyrating motion with her hips again?

A:      No.

Q:      After you had that conversation with Ms. Flores, did Ms.
        Fenelon make any suggestive comments about David
        Figueroa?

A:      I'm not sure.  I don't remember.

Q:      After you had the conversation with Ms. Flores, did Ms.
        Fenelon send you any e-mails that you found to be
        offensive?

A:      No.

*               *               *

Q:      Did Ms. Fenelon make any sexual remarks to you after you
        had your conversation with Reinette Flores?

A:      No.

(Ex. 22 at 227-30)

67.     Thus, the last allegedly offensive remark Ms. Fenelon made directly to

Plaintiff was in November 2005.  (Ex. 22 at 230-31.)

68.     The only other conduct of Ms. Fenelon's that Plaintiff complains of after

this date was a comment Ms. Fenelon made to Ms. Flores about Ms. Flores's pants being too

tight. (Ex. 22 at 230.)

B.    **Plaintiff Admits That a Prior Assault Made Her Overly Sensitive To
"Sexual" Comments**

69.    According to Ms. Cobb, the reason she was offended by Ms. Fenelon's comments was because she was assaulted in 1991 or 1992 and, as a result, is extremely sensitive to "sexual" conversations.  (Ex. 23 at 363.)

70.    Referring to Ms. Fenelon's comment to her friend Juanita, Plaintiff testified as follows:

> Q:    But the incident in the past [the rape] made you sensitive to Ms. Fenelon's comment?
>
> A:    **That was the reason it bothered me, yes, because of what happened in my past.**
>
> Q:    The incident that happened in your past, what year did this incident happen in?
>
> A:    The incident happened in I think '91 or '92.  It could have been '91.

(Ex. 23 at 363.)

> Q:    Everything sexual offends you?
>
> A:    Yes.
>
> Q:    So any reference to sexual intercourse you find offensive?
>
> A:    Not any.  If it's being done negatively, yes, it offends me.

(Ex. 22 at 122.)

71.    Thus, Plaintiff admits that Ms. Fenelon's comments were not objectively offensive.  Id.

72.    Plaintiff did not tell anyone at Morningside about the assault or that she was sensitive to sexual comments because of the past assault.  (Ex. 22 at 125.)

## VI.   **PLAINTIFF'S POOR PERFORMANCE**

73.   As described above, Plaintiff was responsible for organizing and maintaining the files for the HHAs and PCAs.  (Ex. 22 at 283; Ex. 3.)

74.   This was critical because failure to comply with state requirements could have resulted in Morningside being shut down by the NYS DOH.  (Ex. 22 at 283-84.)

75.   Once Ms. Flores came on board, she noticed problems with Ms. Cobb's work almost from the start.  (Ex. 25 at 18.)   She verbally counseled Ms. Cobb about issues with her work, starting in the Fall of 2005.  (Ex. 25 at 16, 18-20; Ex. 24 at 125.)

76.   Plaintiff admits that more than five months into her employment, in November 2005, the files were still missing documentation and were not in compliance.  (Ex. 23 at 313)

77.   Indeed, on November 8, 2005, out of 88 files, only 28 were fully compliant.  (Ex. 13.)  **Thus, 68% of the files were not compliant.**

78.   Plaintiff admits that she received an e-mail from her supervisor on November 7 and 8, 2005 concerning this deficiency.  (Ex. 23 at 311-12.)

79.   In December of 2005, Plaintiff advised Ms. Wheeler-Smith that she was "overwhelmed" by having to answer the phones and do other work as well.  (Ex. 22 at 168.)  This is despite the fact that Plaintiff was responsible for less than 1/6th the number of files she allegedly had been responsible for at her previous position at Premier Home Health Agency.  (Ex. 23 at 309.)

## VII.   PLAINTIFF'S STRATEGICALLY-TIMED MEETINGS WITH MANAGEMENT AND HUMAN RESOURCES

### A.   Plaintiff's First Strategically-Timed Discussion with Management

80.   In late 2005 or early January 2006, Plaintiff learned that the Human Resources Department at Morningside would be reviewing employees' personnel files, including background checks.  (Ex. 22 at 237.)

81.   Plaintiff was nervous that Morningside would see her criminal convictions and fire her.  Plaintiff therefore made the decision to disclose her conviction record to her manager Ms. Flores.  Plaintiff testified as follows:

> Q:   Why at that point in time did you decide to speak with Reinette about your criminal background?
>
> A:   because they – because it would have come up and because human resources was retrieving files.
>
> *        *        *
>
> Q:   Were you worried because you knew that Ms. Wheeler-Smith and the management of Morningside At Home did not know you had a criminal background?
>
> A:   Correct.
>
> Q:   So you were worried that this was going to come out and you might lose your job?
>
> A:   Correct.

(Ex. 22 at 237, 238-9.)

82.   Thus, but for a fear of losing her job, Plaintiff would not have disclosed the convictions to her manager.  (Ex. 22 at 238-39.)

83.   Morningside was supportive of Plaintiff, and did not take any adverse action against Plaintiff on account of either her failure to disclose or the convictions themselves.  (Ex. 26 at 48, 54-56.)

**B.     Events Leading up to Plaintiff's Second Strategically-Timed Discussion with the Human Resources Department**

84.     The week of January 17, 2006, Cobb had plans to take vacation and go to Florida. Ms. Flores had approved this vacation request in December. (Ex. 22 at 196, 198; Ex. 14.)

85.     The week before the scheduled vacation, however, Ms. Fenelon and Ms. Flores advised Plaintiff that she would not be permitted to take vacation at that time because of business needs. (Ex. 22 at 184-87, 196.) Specifically, Ms. Fenelon had an orientation scheduled for the weekend of January 21 and needed Plaintiff's assistance in putting the orientation packets together and making sure the attendees had the proper documentation in place – all of which were part of Plaintiff's responsibilities. (Ex. 22 at 195, 396-97; Ex. 14.)

86.     Despite the specific request that Plaintiff put the packets of orientation materials together, Plaintiff failed to complete the task correctly. (Ex. 23 at 396-97; Ex. 15.) When Ms. Fenelon tried to begin the orientation class, she found the packets were incomplete. The orientation was held in a separate building from where the materials were stored. Ms. Fenelon had to interrupt the orientation class and go to the other building to get the materials for the attendees. (Ex. 15; Ex. 25 at 79.) She also had to make copies of documents that should have been copied by Ms. Cobb prior to the orientation. (Ex. 24 at 113-14.)

87.     As a result of this incident and their continuing dissatisfaction with Plaintiff's work performance, Ms. Flores, Ms. Fenelon and Ms. Wheeler-Smith had a meeting with Plaintiff on or about January 24, 2006 to discuss Plaintiff's poor performance. (Ex. 23 at 448, Ex. 15.) In an e-mail describing the meeting, Ms. Flores wrote:

> "Employee failed to produce complete orientation packets for a
> class held on 1/21/06. This caused the Director Abi Myrna
> Fenelon, RN BSW to have to complete the packets with all
> required documents in order to complete orientation successfully.

> Because this was not completed by Mrs. Cobb, orientation was
> disrupted. . . . During the meeting and throughout everyday,
> Mrs. Cobb displays resistant behavior to instruction and does not
> seem to care for the team approach. . . ."

(Ex. 15.)

88.     On or before January 25, 2006, Ms. Flores, Ms. Fenelon and Ms. Wheeler-
Smith also had a discussion with Plaintiff regarding vacation time. Plaintiff requested that she be
given both the week of January 30 and the week of February 17 for vacation. (Ex. 14.) Plaintiff
was advised during this meeting, however, that because of work demands, she would not be
permitted to take vacation the week of January 30, but that she could take the week of February
17. (Id.) Ms. Fenelon memorialized this vacation dispute in a writing dated January 25, 2006.
(Id.)

### C.     Plaintiff Sets Up a Meeting with Human Resources to Lodge Her Written Complaint Against Fenelon Just ONE DAY After Fenelon Denies Her Vacation Request and After She Has Been Verbally Reprimanded for Poor Performance

89.     On the heels of the meeting concerning Plaintiff's poor performance and
the denial of her vacation request – Plaintiff lodged her complaint about Ms. Fenelon. (Ex. 23 at
398-400, 448, Ex. 15; Ex. 24 at 148-49.)

90.     On January 25, 2006, a days after the counseling meeting with her
managers, Ms. Cobb e-mailed Renee Greer in the Human Resources Department and asked to
meet with her. Ms. Greer responded immediately and agreed to meet Ms. Cobb the next day.
(Ex. 22 at 240-41; Ex. 16.)

91.     Prior to that meeting, Ms. Cobb wrote a letter complaining to Human
Resources about Ms. Fenelon. (Ex. 17.)

92.    Ms. Cobb met with Renee Greer on January 26, 2006, of Human Resources. During their meeting, Ms. Cobb submitted to Ms. Greer the letter, which was dated January 25, 2006, describing the nature of her complaint. (Ex. 16; Ex. 22 at 241.)

93.    The letter complained only about the incident that had occurred on November 27, 2005, wherein Ms. Fenelon introduced Ms. Cobb to her friend, Juanita. (Ex. 17.)

94.    The letter also alleged that Ms. Cobb had made some other off-color remarks, but it did not specify what those remarks were or when they were said. (Ex. 17.)

**D.    Morningside Promptly Addresses Plaintiff's Written Complaint**

95.    Upon receiving Plaintiff's written complaint, Morningside immediately conducted a thorough investigation of the matter, headed by Dorothea Ferguson-Bell, Vice President of Human Resources. (Ex. 26 at 71-73, 92-93.) Human Resources interviewed Ms. Fenelon, Ms. Flores and Ms. Wheeler-Smith. (Ex. 24 at 73-75; Ex. 25 at 64-65; Ex. 26 at 71-73.) Ms. Fenelon admitted to making the joke in November to her friend Juanita concerning oral sex. She said that she was only "joking" and that Ms. Cobb did not seem offended at the time. (Ex. 26 at 92.)

96.    By January 31, 2006 – just three business days after Ms. Cobb complained to Human Resources – the investigation was complete. Ms. Fenelon was first told that she would have to apologize to Ms. Cobb. (Ex. 26 at 92-3; Ex. 18; Ex. 24 at 104-06.) The decision was made to reprimand Ms. Fenelon with a written warning, and to counsel her about her use of bad language. Additionally, Morningside required Ms. Fenelon to participate in training.

97.    Ms. Wheeler-Smith also had a meeting with Ms. Cobb and Ms. Fenelon. At that meeting, Ms. Fenelon apologized to Ms. Cobb for the conversation, both orally and in writing. (Ex. 26 at 105-6; Ex. 18.)

**VIII.   PLAINTIFF'S POOR PERFORMANCE CONTINUES**

98.     Plaintiff's poor performance continued after she made her complaint to Human Resources. (Ex. 25 at 127; Ex. 24 125-27; Ex. 6, 7, 8, 9.)

99.     Most significantly, Plaintiff failed to properly monitor the documentation for the HHAs and PCAs and input their information into the computer system. (Ex. 26 at 112-13 ) Additionally, her failure to maintain complete and updated data for the HHAs and PCAs on the system prevented Morningside from being able to generate accurate reports or maintain accurate statistics concerning these employees. (Ex. 5.) Put simply, Plaintiff was not doing her job.

100.    The files that Plaintiff was solely responsible for were incomplete and in disarray, and many were missing legally mandated documentation. (Ex. 26 at 140-41; Ex. 25 at 147-49; Ex. 5.)

101.    By March of 2006, the situation with the files was so dire that Morningside actually hired a temporary employee to enter the information into the system. (Ex. 25 at 153-4; Ex. 23 at 319.) This would not have been necessary if Ms. Cobb had simply done her job. (Ex. 5.)

102.    Indeed, even at the time of Plaintiff's termination, she still had not achieved success in bringing all of the files into compliance. (Ex. 23 at 315-16.)

103.    In addition to her failure to get the files in order, Plaintiff also became insubordinate, uncommunicative, talking back to her supervisors, and failing to comply with office procedures. (Ex. 26 at 121-22, 127-29; Ex. 25 at 112-13; Ex. 6, 7, 8, 9.)

104.    For example, Plaintiff was explicitly told not to leave employee files or folders in or on her desk. Such files and folders contain confidential information and this confidentiality had to be maintained by the Agency. (Ex. 26 at 120; Ex. 3.)

105.    Plaintiff was also explicitly told that she and her co-workers—Lisette Rivera and Theresa Smith—were to notify Ms. Flores upon leaving for and returning from lunch. (Ex. 19; Ex. 21, Ex. 25 at 123.)

106.    Plaintiff failed to follow this simple protocol.  (Ex. 6.)

107.    Incidentally, although Plaintiff alleges that she was the only employee who went out for lunch, and that this requirement to check-in somehow constituted harassment, Plaintiff's own writing indicates that Ms. Rivera and Ms. Smith also left the building for lunch. Specifically, Plaintiff complained about them going out together and leaving her to answer the phones by herself.  (See Ex. 20.)

108.    On February 9, 2006, Plaintiff received a verbal warning for, *inter alia,* leaving employee files on or inside her desk and failing to notify Ms. Flores before she left for lunch and when she returned.  (Ex. 6.)

109.    Plaintiff was further advised that "any repeat of [that] behavior [would] be grounds for further disciplinary action, up to and including termination of employment." Id.

110.    Plaintiff refused to sign the warning.  Id.

111.    On February 14, 2006, Plaintiff received her First Written Warning for: (1) insubordinate behavior (failing to respond to a supervisor); (2) failing to input information for new employees into the computer system; and (3) failing to notify Ms. Flores upon leaving for and returning from lunch.  (Ex. 7.)

112.    Plaintiff again refused to sign the warning.  Id.

113.    Ms. Flores tried a different approach with Plaintiff on March 6, 2006.  In an e-mail containing directions for the staff members, Ms. Flores wrote that Plaintiff was doing a

"great job." (Ex. 19.) Ms. Flores did not actually believe that Plaintiff was doing a great job, but she hoped to motivate her with those words of encouragement. (Ex. 25 at 126-27.)

114.    Ms. Flores' efforts failed. (Ex. 8, 9.)

115.    On March 20, 2006, Plaintiff received a Second Written Warning for insubordinate and disrespectful behavior.  Specifically, Plaintiff had been disrespectful to her supervisor, Ms. Flores, after **Ms. Flores simply placed an envelope addressed to Plaintiff on Plaintiff's desk**. (Ex. 8.)  Plaintiff admits that she may have used an "angry tone" with Ms. Flores. (Ex. 23 at 416-417.)  According to Plaintiff, this envelope contained sensitive information; however, Ms. Flores had no reason to know this to be true.  (Ex. 23 at 416, Ex. 25 at 129-131.)

116.    That same day, Plaintiff received a Third Written Warning, also for insubordinate and disrespectful behavior.  In addition to using an inappropriate tone with a member of management, Plaintiff stayed at her desk to apply make-up when an emergency staff meeting was called, complaining that she had planned to leave for lunch.  In doing so, she kept the other staff members and a member of management waiting. (Ex. 9.)  Plaintiff acknowledged that she stayed at her desk to put make-up on.  (Ex. 23 at 420.)

## IX.    PLAINTIFF WAS TERMINATED AFTER HER WORK DID NOT IMPROVE

117.    With no improvement by March of 2006, Gay Wheeler-Smith made the decision that the Agency could no longer risk being found non-compliant with state regulations, should the NYS DOH conduct an audit.  The Agency needed a Compliance Officer who would actually make sure that the HHAs and PCAs were up to date and in compliance with the NYS DOH regulations.  (Ex. 26 at 133-35.)

118.    Accordingly, Gay Wheeler-Smith, made the decision to terminate Ms. Cobb's employment, effective March 22, 2006.  (Id.; Ex. 5.)

119.    Ms. Wheeler-Smith directed Ms. Flores to effectuate the termination with a letter.  (Ex. 26 at 135-36.)  The letter states, in pertinent part:

> You continue to be unsuccessful at meeting one of the primary tasks as indicated in your job description.  Specifically, you have not maintained HHA/PCA profiles, certificates and have continued to neglect ensuring compliance with all NYS DOH regulations. The primary task of maintaining these files and the extreme importance of entering compliance information was addressed by [Reinette Flores] and reiterated as a directive to you.

> *       *       *

> It has been identified that the majority of our HHA/PCA's have incomplete data and records that you are solely responsible for entering.

(See Ex. 5.)

120.    Ms. Fenelon was not involved in the decision to terminate Plaintiff.  (Ex. 26 at 142; Ex. 24 at 134-35.)

121.    Incidentally, the woman who was hired to replace Plaintiff as Compliance Coordinator, Alta Gracia Ramirez, is responsible for almost 200 Aides, while Plaintiff was only responsible for less than 100 Aides.  (Ex. 25 at 158.)  Ms. Ramirez has been able to successfully manage the workload and keep the documentation for all of these Aides in compliance without any assistance. (Ex. 25 at 158.)

Dated: New York, New York
       March 31, 2008

KELLEY DRYE & WARREN LLP

By: _____
       Barbara E. Hoey
       Elizabeth A. Quinlan
       Jessica L. Berenbroick
101 Park Avenue
New York, New York 10178
(212) 808-7800
Attorneys for Defendants