UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
RHONDA COBB,

                    Plaintiff,

          -against-                          06 Civ. 13161(DAB)
                                             MEMORANDUM & ORDER
MORNINGSIDE AT HOME, INC. and ABI
MYRNA FENELON,

                    Defendants.
-----------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Plaintiff Rhonda Cobb ("Plaintiff" or "Cobb") has brought

this suit under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. Sec. 2000e et seq. ("Title VII"),

Section 296.1 of the New York State Human Rights Law ("NYSHRL"),

and Section 8-107 of the New York City Human Rights Law

("NYCHRL"), alleging that Defendants, Morningside at Home, Inc.,

("Morningside") and Abi Myrna Fenelon ("Fenelon") created and

condoned a sexually hostile work environment, failed to take

steps to stop sexually offensive conduct, and terminated

Plaintiff in retaliation for her complaints about that

environment.  (Compl. at ¶¶ 29-42.)  Now before this Court is

Defendants' Motion for Summary Judgment on each of these claims.

For the reasons contained herein, Defendants' Motion for Summary

Judgment on Plaintiff's Hostile Work Environment claim is

GRANTED, and Defendants' Motion for Summary Judgment on

Plaintiff's Retaliation claim is DENIED.

1

### I. BACKGROUND

Defendant Morningside at Home, Inc. is a not-for-profit corporation that, among other services, owns a licensed Home Care Service Agency and provides aging patients in the Bronx with home care services.   (Def. 56.1 Stmt. at ¶¶ 1,2.)[1]

Plaintiff was hired by Morningside in June 2005 as a "Compliance Coordinator."   (Id. at ¶ 7.)   As Compliance Coordinator, Plaintiff was responsible for making sure that Defendant Morningside's Home Health Aides (HHAs) and Personal Care Aides (PCAs) ("Aides") qualifications were in compliance with New York State Department of Health regulations, and that the proper documents were contained in their files.   (Id. a t ¶¶ 6, 7.)   In addition, during the process of hiring new employees, Plaintiff was responsible for scheduling applicant interviews, collecting post-interview information, verifying applicants' references, verifying that applicants had completed physical exams, and conducting criminal background checks, among other

---

[1]   The facts of this case also refer to "Morningside House"; however, the record is unclear as to the precise relationship between the two entities.  Gay Wheeler-Smith the former Director of Patient Services of Morningside at Home described the relationship as: "Morningside House is the nursing home which is the parent company to the long term home health care program, as well as Morningside at Home, which is an affiliation.  They're affiliates."   (Def. Ex. 26, Wheeler-Smith Dep. at 6:9-18.)   She later was asked if Morningside at Home "is a separate legal entity" to which she responded, "yes."   (Id.; Def. Ex. 2.)

things.  (Id. at ¶¶ 22-27.)  Plaintiff was primarily supervised by Reinette Flores, who was hired as a Program Manager in August of 2005.[2]  (Id. at ¶ 30.)

Defendant Fenelon was hired by Morningside in September 2005 as a Nursing Supervisor.  (Def. 56.1 Stmt. at ¶ 8.)  Fenelon was responsible for conducting orientations for newly-hired Aides, "testing the competencies of the Aides by given [sic] them examinations", and generally overseeing the Aides.  (Id.)  Approximately two months after she was hired, Fenelon became the Director of the Assisted Living Program but maintained certain Nursing Supervisor duties.  (Id. at ¶ 9.)  According to Plaintiff, Fenelon was hired by Morningside's Director of Patient Services Gay Wheeler-Smith ("Wheeler-Smith"); Plaintiff alleges that Wheeler-Smith and Fenelon had previously worked together and Wheeler-Smith had called Fenelon to tell her of the opening at Morningside.  (Pl. Aff. at ¶ 6.) Plaintiff states "[t]hey were known to me and to my co-workers as being personal friends from either their days together in school and/or in a prior employment setting."  (Id.)

_____

[2]  Plaintiff alleges that she was also supervised by Fenelon who became a Director within a month of her hire and was superior to Plaintiff in that she could discipline Plaintiff if necessary. (Pl. 56.1 Counter-Stmt. at ¶ 36.)

Allegations of a Hostile Work Environment

The following events are alleged by the Plaintiff;
Defendants do not concede that they occurred.    (Def. 56.1 Stmt.
at ¶¶ 49-56.)   Plaintiff alleges that shortly after Defendant
Fenelon was hired her "work environment changed dramatically" –
"Fenelon began exhibiting behavior and making remarks of a
grossly sexual nature in front of the women in the office."   (Pl.
Aff. at ¶ 7.)

In late September 2005 Fenelon "unexpectedly gave
[Plaintiff] a firm pat on her buttocks while [Plaintiff] was
bending over a file cabinet."   (Id.)   Plaintiff immediately asked
her not to do that again.   (Id.)   Shortly after, Fenelon told
Plaintiff that she had "big lips and big breasts."   (Id.)
Plaintiff states that "[t]his remark came out-of-the-blue, while
I was trying to do my work" and that she "was too shocked to
comment."   (Id.)   On October 28, 2005 Plaintiff received an email
from Fenelon asking "Rhonda, why are you so big?"   (Id.)   The
email also stated "[i]t is costing too much money for you to sit
on the chairs."   (Id.)

In addition, Fenelon "regularly made a gyrating sexual
intercourse motion with her hips every time the name of a male
co-worker, Brian Kelly, was mentioned."   (Id.) Fenelon alleged
said that another male co-worker, Victor Pagan, "was gay, that

4

'he takes in the ass', and that 'all he could do is let me sit on his face.'"   (Id.)   Once, while standing near Plaintiff's work station, Fenelon allegedly "pantomimed the act of fellatio and then asked Wheeler-Smith 'What is this?'" to which "Ms. Wheeler-Smith responded: 'If you are doing what I think you are doing, you are doing it wrong because it is not supposed to be hitting the sides of your mouth.'"   (Id.)   Fenelon and Wheeler-Smith allegedly laughed about this together.   (Id.)

On November 16, 2005, Fenelon forwarded an email she had sent to Figueroa which stated that Fenelon "wanted to meet Mr. Figueroa in the parking lot because she wanted his body."   (Id.) In her deposition, Plaintiff described the email from Fenelon as reading (translated to English): "Please my big love, I want your body today.   I need much loving today.   Meet me in the parking lot today."   (Pl. Dep. at 148:16-19.)   Fenelon personally alerted Plaintiff to check her email and look at it.   (Id. at 150:4-5.) Plaintiff believes that two other women, but no other men, received the e-mail as well.   (Id. at 152:24-153:3.)

In her deposition Plaintiff describes a different occasion in which Figueroa was in the room with Plaintiff and perhaps one other woman, and "[w]hat happened was David was standing there helping – I think David was standing there helping Ivette with a problem on a computer and Abi [Fenelon] stood behind him and she

was, you know, saying look at this, talking about his buttocks and she was saying look at all of this.  This is mine, and stuff like that."  (Id. 139:22-140:6.)

On or about November 27, 2005, Fenelon went to Plaintiff's work area with a friend, Juanita, and picked up a photo of Plaintiff's grandson from her desk.  (Pl. Aff. at ¶ 10.)  Fenelon told Juanita that Plaintiff's daughter had "given birth to him at the age of 14."  (Id.)  Plaintiff responded "no, my daughter was 21 [at the time]."  (Id.)  Juanita then noted how young Plaintiff looked.  (Id.)  Fenelon responded that Plaintiff "looked young only because [Fenelon pantomimes the act of fellatio]."  (Id.) According to Plaintiff, Juanita "sought to end the conversation by saying that, whatever I was doing, it was keeping me young-looking."  (Id.)  But, "Fenelon persisted by saying '[y]ou know what keeps her young? She swallows."  (Id.)  That incident made Plaintiff feel "humiliated, embarrassed and degraded."  (Id. at ¶ 11.)  Plaintiff states that she was "too shocked and embarrassed at that moment to say anything" and because Fenelon was a manager Plaintiff "had to be careful how I reacted to her."  (Id. at ¶ 12.)

Defendant describes the interactions in the office as women chatting during the day and sometimes joking about sex and talking about personal relationships. (Def. 56.1 Stmt. at ¶ 36.)

6

Defendant further states that the "reason" Plaintiff was offended by Fenelon's comments was that she was "overly sensitive to 'sexual' comments" because she was the victim of stranger-rape in the early 1990s. (Id. at ¶ 69; Pl. Dep. at 360-363.)  During her deposition Plaintiff was asked: "But the incident in the past made you sensitive to Ms. Fenelon's comment?"; she responded, "[t]hat was the reason it bothered me, yes, because of what happened in my past."  (Id. at ¶ 70.)  Therefore, Defendants claim as "fact" that "Plaintiff admits that Ms. Fenelon's comments were not objectively offensive."  (Id. at ¶ 71.) Plaintiff counters that she should not be disqualified, by reason of her prior physical assault, from complaining about sexual harassment.  (Pl. 56.1 Counter-Stmt. at ¶ 71.)

### Plaintiff's Complaints

The day after the November 27, 2005 comment Plaintiff reported the incident to her supervisor, Flores.  (Def. 56.1 Stmt. at ¶ 57.)  Defendant alleges that Plaintiff "instructed Ms. Flores, however, that she did not want a formal complaint made and that she did not want Ms. Flores to speak with Ms. Fenelon." (Id. at ¶ 58.)  Plaintiff disputes this, and alleges that "I did not instruct Ms. Flores in any manner about what to do regarding my complaint; Ms. Flores was my Supervisor and I expected that

she would know what to do, without my input, and would get back to me." (Pl. Aff. at ¶ 13.)   Defendants allege that Flores nevertheless spoke with Fenelon on the same day and "advised Ms. Fenelon that Plaintiff did not want her to joke with her in that way." (Def. 56.1 Stmt. at ¶ 59.)[3]

In December 2005, because Plaintiff had received no response from Flores, Fenelon had not apologized, and Plaintiff alleges she was "still upset about her behavior" she complained to Theresa Smith, who Plaintiff alleges held the title of "Human Resources Coordinator." (Pl. Aff. at ¶ 15.)[4] Again, Plaintiff received no response, which made her feel "even worse about what Ms. Fenelon had done." (Id. at ¶ 16.)

In mid-January 2006, Plaintiff learned that the Human Resources Department of Morningside House (see supra fn. 1) would take over and permanently oversee the personnel activities of Defendant Morningside at Home. (Id. at ¶ 21.)   At that time Plaintiff received an orientation including a film on sexual harassment which explained steps an employee should take if he or

---

[3]  Plaintiff disputes this noting that Fenelon testified in her deposition that she "was never notified or told...that [Plaintiff] was ever uncomfortable" and that Flores "never said it [Plaintiff's complaint to Flores] was a complaint". (Pl. 56.1 Counter-Stmt. at ¶ 59.)

[4] Defendant alleges that Smith was a "payroll coordinator" but that Cobb was told that Smith's title was "Human Resources Coordinator." (Def. 56.1 Stmt. at ¶¶ 61, 62.)

she felt aggrieved.  (Id.)  Around that time, Fenelon made
another comment in Plaintiff's presence that was "of a grossly
sexual nature"; Fenelon stated to Flores, in front of Plaintiff,
that Flores' pants "look nasty, they are all in your pussy and it
looks disgusting."  (Id. at ¶ 22.)

On or about January 18, 2006, Plaintiff began writing a
complaint; she filed that complaint on January 26, 2006 during a
meeting with Renee Greer of Human Resources.  (Id. at ¶ 23.)  On
February 3, 2006, Fenelon received a "Confidential Memorandum"
from Dorthea Bell, Vice President of Human Resource Development,
in which Bell writes to Fenelon that, following an earlier
meeting in which Fenelon admitted to having an "inappropriate"
conversation on November 27, 2005, she was being admonished.
(Pl. Aff. Ex. D.)  In that memorandum Bell also writes, "we find
that your [Fenelon's] comportment in this instance was
inappropriate" and "any repeat of this sort of behavior will be
grounds for further discipline, up to and including termination."
(Id.)

### Plaintiff's Termination; Morningside's Proffered Reasons for the Termination; Plaintiff's Performance

Plaintiff was issued a termination letter on March 22, 2006,
which stated, inter alia, "you have not maintained HHA/PCA
profiles, certificates and have continued to neglect ensuring

compliance with all NYS DOH regulations."   (Hoey Decl. Ex. 5.)

Plaintiff alleges that she was terminated in retaliation for her

complaints about sexual harassment in the workplace.   Defendant

alleges that Plaintiff was terminated because of her performance.

Plaintiff and Defendants offer very different characterizations

of the events leading to Plaintiff's termination.

Plaintiff alleges that from the time she was hired in June

2005, through January 2006, "the situation with the Aides files

(which were in disarray when I began) improved to the extent that

the majority of the Aides who went out on assignment were in

compliance with applicable government regulations, and their

files were substantially complete."   (Pl. Aff. at ¶ 30.)   She

affirms that "[a]s to those Aides files that were not yet

complete, this was not because of any shortcoming or fault on my

part; rather, there were several reasons for this occurring: For

instance, the Aide might be a new hire and may not have had

sufficient time to complete his/her paperwork; or the Aide might

have failed to respond to my calls and directions to produce

needed documentation (which only the Aide, and not I, could

supply)."   (Id. at ¶ 31.)   Plaintiff states, "[a]lthough things

were not perfect, I was doing the best I could, and my Managers

were aware of that and were willing to work with me, until I

filed my Fenelon complaint."   (Id. at ¶ 33.)   Plaintiff alleges

that at the time she was hired in June 2005, "the Aides files were in disarray and the majority, if not all, of the said files had missing documentation." (Pl. 56.1 Counter-Stmt. at ¶ 77.) However, Plaintiff states that, "[b]y January 2006, eighty percent (80%) of the Aide files that Plaintiff was responsible for were in compliance." (Id.)

Defendants, however, characterize the events differently. Defendants allege that once Ms. Flores came on board, she recognized problems with Ms. Cobb's work, and "verbally counseled Ms. Cobb" starting in the fall of 2005. (Def. 56.1. Stmt. at ¶ 75.) Plaintiff "disputes the word 'counseled'; she claims that she and Ms. Flores, who were working together on the Aides files, "spoke often about how to best bring the files into complete compliance." (Pl. 56.1 Counter-Stmt. at ¶ 75.) On November 7-8, 2005, Plaintiff was cc'd on an email exchange between Flores and Wheeler-Smith discussing the number of non-compliant folders. (Def. 56.1 Ex. 13.)

In late 2005 or early January 2006 the Human Resources Department at Morningside announced they would begin reviewing employees' personnel files, including background checks. (Def. 56.1 Stmt. at ¶ 80.) Because Plaintiff had past criminal convictions, she was worried that her criminal background, which she had not previously disclosed, would come out and that she

11

would lose her job.  (Def. Ex. 22, (Pl. Dep.) at 327-340.)  She
decided, at that time, to speak with Flores about her criminal
background.  (Id.)  During her deposition, Wheeler-Smith recalled
her reaction to learning of Cobb's criminal background

> "...I made the decision.  Okay she is experienced,
> I want to keep her.  She is a nice person.  We
> like her.  We need her to complete the forms and
> complete the files.  We are doing everything
> possible to work with her to make that happen.
> So, it was my decision to keep her on, even though
> I didn't know the specifics of what had occurred."

(Def. Ex. 26 at 48.)  Plaintiff argues that, "[b]ecause no
adverse action was taken by Defendants in January 2006, and
because Defendants were supportive of Plaintiff, it may be
inferred that Defendants wanted to retain Plaintiff and that her
job performance was satisfactory."  (Pl. 56.1 Counter-Stmt. at ¶¶
80-83.)  Defendants agree at least that "Morningside was
supportive of Plaintiff, and did not take any adverse action
against Plaintiff on account of either her failure to disclose or
the convictions themselves."  (Def. 56.1 Stmt. at ¶ 83.)

On the subject of Plaintiff's job performance, Defendants
also point to an "incident" in which Plaintiff failed to include
a sign-in sheet in the orientation packet for an orientation
Fenelon was scheduled to give for the weekend of January 21.
(Def. 56.1 Stmt. at ¶ 86; Pl. Dep. at 396-397.)  Plaintiff argues
that "this was the first time a piece of paper was missing from

12

any of the many orientation packets that Plaintiff prepared."
(Pl. 56.1 Counter-Stmt. at ¶ 86.)   Nevertheless, Defendants state
that they held a meeting with Plaintiff on January 24 "to discuss
Plaintiff's poor performance."   (Def. 56.1 Stmt. at ¶ 87.)
Plaintiff states that the "meeting held on or about January 24,
2006 was 'cordial' and there was no 'counseling' or warnings
given to Plaintiff therein about her job."   (Pl. 56.1 Counter-
Stmt. at ¶ 87.)

### Alleged Retaliation

On January 26, 2006 during a meeting with Renee Greer of
Human Resources (which Plaintiff alleges occurred at 8:45 AM),
Plaintiff filed the written complaint against Fenelon described
above.   (Id. at ¶ 87.)   On that same day, at 12:32PM, Flores sent
a draft of a "disciplinary action" to be taken against Plaintiff
for failure to include the sign-in sheet in the packets, for
failing to "move into the area she was assigned to be the end of
the day",[5] and for displaying "resistant behavior to instruction"
and not seeming "to care for the team approach."   (Def. Ex. 15.)
The memo further states that, "Mrs. Cobb has distanced herself
from her co-workers.   When asked by Mrs. Wheeler-Smith what it is

---

[5]   Parts of Flores deposition suggests that the move was not
discussed in the January 24 meeting.   (Def. Ex. 25 at 88.)

13

that is bothering her; Mrs. Cobb replied 'I am not comfortable speaking about it with anyone here.'" (Id.)

Defendants argue that Plaintiff's "poor performance continued after she made her complaint to Human Resources." (Def. 56.1 Stmt. at ¶ 98.) Plaintiff characterizes this period, following her filing of the written complaint against Fenelon, as a time when "she began to be hyper-managed and hyper-criticized by her superiors" and "faulted for de minimus [sic] infractions." (Pl. 56.1 Counter-Stmt. at ¶¶ 103, 105.)

According to Defendants, "[m]ost significantly, Plaintiff failed to properly monitor the documentation for the HHAs and PCAs and input their information into the computer system." (Def. 56.1 Stmt. at ¶ 99.) Defendant states that "[b]y March 2006, the situation with the files was so dire that Morningside actually hired a temporary employee to enter the information into the system." (Id. at ¶ 101.) Plaintiff disputes that the situation was "dire" and states that "[i]n March 2006, the majority of the files were in compliance, save for new Aides that were being sent out by Morningside before their paperwork could be completed." (Pl. 56.1 Counter-Stmt. at ¶ 101.) Further, Plaintiff states that, "Defendants did not complain to Plaintiff in writing about the state of the Aides files prior to issuing their Termination Letter on that subject." (Id.) Defendant

14

states that, "in addition to her failure to get the files in
order, Plaintiff also became insubordinate, uncommunicative,
talking back to her supervisors, and failing to comply with
office procedures."  (Def. 56.1 Stmt. at ¶ 103; Pl. 56.1 Counter-
Stmt. at ¶ 103.)

On February 9, 2006, Plaintiff received a "verbal warning"
(which was, in fact, written) for leaving employee files on or
inside her desk rather than in a designated file cabinet and for
"non-verbal responses when spoken to."  The warning also
contained a notation that office email "should not be used as a
passive aggressive tool to communicate ill feelings", and a
reminder to notify Flores by phone before and after her lunch
hour.  (Def. Ex. 6.)  That warning further noted that, "any
repeat of this behavior will be grounds for further disciplinary
action, up to an including termination of employment."  (Id.)  On
February 14, 2006, Plaintiff received her first "written warning"
which stated that she "failed to comply" with some of the
February 9, 2006 mandates.  (Def. Ex. 7.)  This warning, which
came from Flores, stated that Plaintiff 1) continued "to
demonstrate non verbal responses when given a directive, i.e.
hanging up the telephone without finalizing a verbal response" 2)
failed "to meet the mandate to key in new employees in Sandata as
soon as you receive the information that they are working" and 3)

15

failed to notify Flores upon returning from lunch on February 13, 2006, and February 14, 2006.  (Id.)

On March 6, 2006, Flores sent an email which included the statement, "Rhonda by the way, you're doing a great job!!!!!!" (Def. Ex. 19.)  Defendants state that "Flores didn't actually believe that Plaintiff was doing a great job" but rather, "hoped to motivate her with those words of encouragement."  (Def. 56.1 Stmt. at ¶ 113.)

Then, on March 20, 2006, Plaintiff received both her second and third written warnings.  The second warning, addressed a situation in which Flores left an envelope from Human Resources on Plaintiff's desk; when Flores returned, Plaintiff questioned her: "who left this on my desk like that?"  (Def. Ex. 8.) According to the warning from Flores, "[t]he tone, in which you asked this question, was unacceptable and insubordinate."  (Id.) The third written warning, issued by Fenelon on the same day as Flores' second warning, concerned office etiquette, and warned Plaintiff about her behavior on three occasions. (Def. 56.1 Stmt. at ¶ 116.) First, Fenelon warned that on "March 17, 2006, you publically debated a decision I made regarding the policy and procedure on compliance issues" and that Plaintiff's "tone was inappropriate for a support staff member."  (Def. Ex. 9.) Second, Fenelon warned that "[w]hen I called an emergency meeting

16

to discuss compliance issues...you defiantly mentioned under your breath 'It is my lunch time.'" (Id.)  Third, "you are also being written up for not attending a meeting on time...[d]uring the time the meeting was called you were applying make up at your desk." (Id.)  Plaintiff disputes Defendants' characterization of these events.  (Pl. 56.1 Counter-Stmt. at ¶¶ 112-117.)

Plaintiff was terminated effective March 22, 2006, two days after she received the second and third written warnings.  (Def. Ex. 5.)  The Termination Letter describes Plaintiff's failure to maintain the HHA/PCA profiles and certificates; it does not mention any of the office etiquette issues that were the subject of the second and third warnings.  (Id.)

## II. DISCUSSION

A.  <u>Legal Standard for Summary Judgment</u>

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>see also</u> <u>Hermes Int'l v. Lederer de Paris Fifth Ave.,</u> <u>Inc.,</u> 219 F.3d 104, 107 (2d Cir. 2000).  Genuine issues of material fact cannot be created by mere conclusory allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable

trier of fact could find in favor of that party." <u>Heublein v.</u>
<u>United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993) (<u>citing</u>
<u>Matsushita Elec. Industr. Co. v. Zenith Radio Corp.</u>, 475 U.S.
574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

 In assessing when summary judgment should be granted, "there
must be more than a 'scintilla of evidence' in the non-movant's
favor; there must be evidence upon which a fact-finder could
reasonably find for the non-movant." <u>Id.</u> (<u>citing</u> <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L.
Ed. 2d 202 (1986)).  While a court must always "resolv[e]
ambiguities and draw[ ] reasonable inferences against the moving
party," <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir.
1986) (<u>citing</u> <u>Anderson</u>), the non-movant may not rely upon "mere
speculation or conjecture as to the true nature of the facts to
overcome a motion for summary judgment." <u>Id.</u> at 12.  Instead,
when the moving party has documented particular facts in the
record, "the opposing party must 'set forth specific facts
showing that there is a genuine issue for trial.'" <u>Williams v.</u>
<u>Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986) (<u>quoting</u> Fed. R. Civ. P.
56(e)).  Establishing such facts requires going beyond the
allegations of the pleadings, as the moment has arrived "'to put
up or shut up.'" <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41
(2d Cir. 2000) (citation omitted).  Unsupported allegations in

18

the pleadings thus cannot create a material issue of fact.   Id.

B.   NYHRL and Title VII Claims

New York State Human Rights Law claims are analytically
identical to claims that arise under Title VII. Hill v. Rayboy-
Brauestein, 467 F. Supp. 2d 336 (citing Torres v. Pisano, 116
F.3d 625, 629 n.1 (2d Cir. 1997) as noting "[w]e have repeatedly
noted that claims brought under New York State's Human Rights Law
are analytically identical to claims brought under Title VII.").
Further, where, as here, parties in a Title VII action do not
distinguish the applicable levels of proof for Title VII and
NYSHRL claims, the Second Circuit has treated them as identical.
Id.   Likewise, New York City Human Rights Law claims are analyzed
under the same framework as Title VII and New York State Human
Rights Law. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.
1 (2d Cir. 2000).

C.   Hostile Work Environment

Title VII of the Civil Rights Act of 1964 provides, in
relevant part, that "[i]t shall be an unlawful employment
practice for an employer ... to discriminate against any
individual with respect to his compensation, terms, conditions,
or privileges of employment, because of such individual's race,

19

color, religion, sex, or national origin." 42 U.S.C. § 2000e-
2(a)(1). The Supreme Court has held that this not only covers
"terms" and "conditions" in the narrow contractual sense, but
"evinces a congressional intent to strike at the entire spectrum
of disparate treatment of men and women in employment." Oncale v.
Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998)
(quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64
(1986)). Further, the Court has found that "[w]hen the workplace
is permeated with discriminatory intimidation, ridicule, and
insult that is sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an abusive
working environment, Title VII is violated." Harris v. Forklift
Systems, Inc., 510 U.S. 17, 21 (1993) (citations and internal
quotation marks omitted).

Even assuming that all of Plaintiff's allegations are true,
a threshold legal question presented by the facts of this case is
whether Title VII protects a Plaintiff whose supervisor created a
work environment permeated by sexual talk and innuendo when both
men and women were the subject of her comments; if such talk were
sufficiently pervasive to alter the terms and conditions of
employment, can it constitute discrimination "because of sex"?

In the relevant case, Oncale v. Sundowner Offshore Services,
Inc., the Supreme Court found that "it would be unwise to presume

20

as a matter of law that human beings of one definable group will not discriminate against other members of their group." 523 U.S. 75, 78 (1998) (quoting Castaneda v. Partida, 430 U.S. 482, 499 (1977)). Indeed, the Court went on to find that Title VII prohibits "sexual harassment of any kind that meets the statutory requirements." Id. at 79-80. Therefore, the fact that Fenelon and Cobb are both women is not dispositive of Plaintiff's harassment claim.

Rather, "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. at 80. "A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." Id. Further, "[a] same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." Id. "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.'" Id. at

21

80-81.

Defendants in this case argue that "Ms. Fenelon allegedly made the same jokes, comments and sent emails to both men and women, and about both men and women." (Emphasis in original) (Def. Mem. of Law at 16.) The crux of their argument is that because Fenelon commented about both men and women she did not "discriminate."

Plaintiff has argued that Fenelon repeatedly went "out of her way" to direct her sexual comments to women, that the "hostility was not aimed at men". (Pl. Op. Mem. of Law at 9-10; Pl. Aff. at ¶ 8, noting "the comments about the men were made mostly to or in front of the women, and behind the men's backs.") Two of the alleged comments were made in the presence, or in an email to, David Figueroa. In the first instance, Fenelon personally alerted Plaintiff to check her email where she found the message to Figueroa about meeting in the parking lot. And it was behind the back of Figueroa, that Fenelon stated to the other women present, "Look at this [pointing to Figueroa's buttocks]; all of this is mine." (Id.)

Fenelon also made comments (and gestures) about male co-workers when they were not present. Plaintiff alleges that when Brian Kelly's name was mentioned Fenelon made "gyrating motions with her buttocks" "many times". (Id. at 112:2-23.) Plaintiff

22

describes, "I believe Abi [Fenelon] said that, we had to go to Brian and then she would just do that dance because I'm assuming that what she was trying to say is that he was gay, you know, he takes in the -."  (Id. 106:13-18.)  Another time, Fenelon was in a work-area with Plaintiff and another female co-worker when Plaintiff asked where Victor Pagan was; Fenelon said she "didn't know where he was at" and then said to Plaintiff and her co-worker "she said that Mr. - she said that he takes it in the rear" and that "all he could do is let her sit on his face." (Id. 99:21-101:15.)

The Supreme Court has directed lower courts to apply "common sense, and an appropriate sensitivity to social context" to claims such as these.  Oncale, at 81-82.  Here, Plaintiff cannot escape that both men and women were the subject of Fenelon's (admittedly) "inappropriate" and "offensive" comments. (Def. Ex. 18; Pl. Aff. at ¶ 7.)  Drawing all inferences in the non-movant Plaintiff's favor, a reasonable jury could not find discrimination "because of sex" on the facts presented.  As a supervisor Fenelon clearly created an environment "tinged with offensive sexual connotations" but there is nothing in the record to show that she was motivated by discrimination.  The fact that many of her comments about men were made behind their backs is not significant where those comments (if only directed at men,

23

for instance) could have themselves constituted sexual

harassment.  Because the touchstone of the Title VII inquiry is

discrimination, and Fenelon's comments were <u>equally</u> offensive to

both men and women, Plaintiff's hostile work environment claim

must fail.  Consequently, Defendant is entitled to Summary

Judgment on Plaintiffs Title VII, NYSHRL and NYCHRL hostile work

environment claims.


D.   <u>Retaliation</u>

In order to establish a prima facie case of retaliation, an

employee must show 1) participation in a protected activity known

to the defendant; 2) an employment action disadvantaging the

plaintiff; and 3) a causal connection between the protected

activity and the adverse employment action.  <u>Feingold v. New</u>

<u>York</u>, 366 F.3d 138, 156 (2d Cir. 2004); <u>Patane v. Clark</u>, 508 F.3d

106, 115 (2d Cir. 2007).  Defendants argue that Plaintiff is

unable sustain the first and third prongs of the test.

As to the first prong, Defendants argue that Plaintiff

lacked a "good faith basis for lodging a complaint and thus did

not engage in a protected activity."  (Def. Mem. of Law at 17.)

To establish participation in a protected activity Plaintiff

"need not prove that the conditions against which he protested

actually amounted to a violation of Title VII", rather Plaintiff

24

must demonstrate "only that [s]he had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Wimmer v. Suffolk County Police Dept., 176 F.3d 125, 134 (2d Cir. 1999).

Defendants argue that Plaintiffs conduct "suggests" that she filed the January complaint with Human Resources because she was angry about a cancelled vacation and wanted to protect her job. Both of those events, which Defendants argue triggered the Complaint, occurred in January 2006. (Def. 56.1 Stmt. at ¶¶ 80-88.) Defendants seem to ignore the fact that Plaintiff's January complaint was in fact her third complaint. Therefore, even applying Defendants' own theory, Plaintiff's first two complaints can hardly be responsive to events which post-dated the complaints themselves.

Regarding the third prong, Defendants argue that Plaintiff will be unable to establish causation because her termination occurred more than two months after her written complaint to human resources. First, Defendants mischaracterize the law surrounding causation in the retaliation context. See Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998) (finding that employee's sexual harassment complaints and her termination were causally connected where her discharge came less than two months after she filed complaint with management and just ten

days after she filed complaint with administrative agency).
Proof of causal connection can be established indirectly by
showing that the protected activity was followed closely by
discriminatory treatment, or through other evidence such as
disparate treatment of fellow employees who engaged in similar
conduct, or directly through evidence of retaliatory animus
directed against a plaintiff by the defendant.  <u>DeCintio v.</u>
<u>Westchester County Medical Ctr.</u>, 821 F.2d 111, 115 (2d Cir.
1987).

In this case, Plaintiff has put forth evidence that prior to
lodging the complaint, her employer was willing to work with her,
because they "liked" her, despite the fact that Plaintiff
improperly failed to disclose a prior criminal conviction.  In
addition, Plaintiff has put forward direct evidence from which a
reasonable juror could determine that retaliatory animus began
literally on the day that she lodged her formal written
complaint.  Starting on the day Plaintiff complained to Human
Resources she began receiving verbal and written warnings.  The
subject of those warnings was not Plaintiff's job performance so
much as her demeanor, and included infractions such as failing to
inform her supervisor after returning from lunch on two
occasions.  Therefore, the Court finds that Plaintiff has put
forward enough evidence to sustain a prima facie case of

retaliation.

Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action. Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001).  The employer here argues that the legitimate reason for Plaintiff's termination is her failure to maintain the Aides' files as required.  However, a reasonable jury could infer from the fact that all of Plaintiff's pre-termination warnings concerned office etiquette and minor infractions, such as failure to store files in the proper cabinet, that the proffered reasons are pretextual.

Consequently, viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, there is sufficient proof for a reasonable jury to find that her termination was carried out in retaliation for her complaints of discriminatory treatment.  Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim is hereby DENIED.

### III. CONCLUSION

For the reasons contained above, Defendants' Motion for Summary Judgment on Plaintiff's hostile work environment claims under Title VII, New York State Human Rights Law, and New York

City Human Rights Law is GRANTED. Defendants' Motion for Summary Judgment on Plaintiff's retaliation claims is DENIED.

Proposed Requests to Charge and Proposed Voir Dire shall be submitted to this Court within 90 days of the date of this Order. A Joint Pre-trial Statement ("JPTS"), which shall conform to the Court's Individual Practices and Supplemental Trial Procedure Rules, shall be submitted within 25 days after the parties submit their Proposed Requests to Charge and Proposed Voir Dire. Memoranda of Law addressing those issues raised by the JPTS shall be submitted on the same day as the JPTS, and responses to those Memoranda shall be submitted no later than 10 days thereafter. There shall be no replies.

SO ORDERED.

DATED:    New York, New York

*March 31, 2009*

*Deborah A. Batts*

Deborah A. Batts
United States District Judge

28